J-S29002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.J.L., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.T.L., FATHER | : : : : : : | |
| | : | No. 527 WDA 2024 |

Appeal from the Order Entered April 10, 2024
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
25 of 2023

BEFORE:  DUBOW, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY DUBOW, J.:                **FILED: November 4, 2024**

J.T.L. ("Father") appeals from the April 10, 2024 order[1] entered in the Butler County Court of Common Pleas that terminated his parental rights to seven-year-old J.J.L. ("Child").  Upon review, we affirm.

The relevant factual and procedural history is as follows.  In February 2022, the Butler County Children and Youth Services ("CYS") received a report that Child's mother, E.C.T. ("Mother"), and Child were homeless after Catholic Charities requested that Mother leave the housing provided by the organization due to Mother's illegal drug use.  At the time, Father was incarcerated for a parole violation and had not had contact with Child for over

_____

[1] The order is dated April 3, 2024, but the court did not docket the order until April 10, 2024.

a year.[2]  On February 24, 2022, the trial court adjudicated Child dependent and ordered him to remain placed in kinship care with his maternal aunt, B.D. ("Maternal Aunt"), after Mother admitted that she was homeless, using heroin, and abusing prescription medication.[3]

The Agency implemented a family service plan in which Father's objectives were to resolve his criminal charges, refrain from further criminal activity, participate in any programming available to him that would assist in his parenting of Child, maintain contact with Child through the Agency, and contact the Agency upon his release from incarceration.

Father remained incarcerated from January of 2021 through January of 2023, when he was released to a halfway house named Renewal, Inc., where he was permitted to obtain employment and participate in visitation with Child.  The Agency referred Father to Family Pathways, who set up visitation with Child every Thursday from 5:00 PM to 7:00 PM.  Father arrived at his first visit over one hour late.  Father attempted to engage with Child, who refused to speak, would only shake his head "yes" or "no," and continuously looked at the ground during the visit.  The next week, on April 13, 2023, Father cancelled his scheduled visit with Child due to transportation issues.

_____

[2] On June 12, 2001, Father pleaded guilty to Aggravated Assault of a Person Less than 16 Years of Age and related offenses and was required to register as a sexual offender for ten years.  Subsequent changes in legislation now require him to register under the Sexual Offender Registration and Notification Act (SORNA) as a lifetime offender.  **See** 42 Pa.C.S. §§ 9799.51–9799.75.

[3] On April 10, 2024, the trial court involuntarily terminated Mother's parental rights to Child.  Mother is not a party to this appeal.

Soon after, Family Pathways moved Father's visits to Saturdays to accommodate Father and called Father six times during the next two weeks to confirm each Saturday visit. Father did not answer or return phone calls from Family Pathways and did not attend additional in-person visits.

On June 27, 2023, the Agency filed a petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

In November of 2023, after Father attended an inpatient drug and alcohol treatment program, the Agency made a referral to Totin Family Services to set up virtual visitation between Father and Child. The first visit occurred on November 14, 2023, and Child continued to be reserved and he only gave "yes" or "no" answers to questions. The visit supervisor had to redirect Father when Father began discussing his drug use and treatment with Child. On December 5, 2023, Father and Child had a second virtual visit which only lasted a few minutes due to Father having technical difficulties. In December, Father corresponded with Totin Family Services via email a few times and the visitation supervisor informed him that visits would be every Tuesday from 5:00 to 5:30 PM and that Father needed to confirm attendance by 10:00 AM the same day. Father did not attend any additional visitation with Child and his last contact with Totin Family Services was on December 27, 2023.

In January of 2024, Father relapsed on illegal drugs, which constituted a technical violation of his parole and prompted the court to reincarcerate

Father with the anticipated release date of April 9, 2024. Father sent Child two or three cards over the three years that he was incarcerated.

Child is placed in pre-adoptive kinship care with Maternal Aunt and her partner, C.J., and their five children, where he has lived since February of 2022. Child is comfortable in the home with his cousins and considers them to be his siblings. Child is thriving in the home and has stopped some previous negative behaviors. When Child was first placed in the home, he engaged in individual therapy and the school placed him in a learning support classroom, but he has recently been successfully discharged from therapy and no longer needs learning support. Child initially presented as extremely shy but is now talkative both at home and in the classroom.

On January 26, 2024, the Agency filed an amended petition which included an additional ground for termination, Section 2511(a)(11), and alleged that Father was required to register as a sexual offender. The court appointed Susan B. Lope, Esq., to serve as both Child's legal counsel and guardian *ad litem* ("GAL"), after determining that there was no conflict between the dual roles.

The court held hearings on February 2, 2024 and March 5, 2024. The Agency presented testimony from Steven C. Braden, licensed bond detective; Eric Bernstein, Psy.D., licensed psychologist; Philip Peters, parole agent; Heather Kniess, Agency intake supervisor; Jamie Scherer, Agency family team facilitator; Jessica Dickey, Totin Family Services visitation supervisor; Michelle Matthews; Totin Family Services case manager; Emma Lynn Fischer, Family

Pathways visitation specialist, Kylee Sheppeck, Family Pathways coordinator; and Kristin Caro, Agency caseworker.

The Agency witnesses testified in accordance with the above-stated facts. In addition, Dr. Bernstein testified as an expert in the field of psychology. Dr. Bernstein informed the court that he performed a parenting capacity as well as a bonding evaluation. Dr. Bernstein testified that he observed an interaction between Father and Child and Father put forth a lot of effort to be playful and engaging while "[Child] remained quiet, passive, and cautious. . . he did not give the impression of feeling confident, secure, and engaged[.]" N.T. Hearing, 2/2/24, at 22. Dr. Bernstein explained that his reports did not give a "formal recommendation" regarding adoption because he did not get an opportunity to evaluate Mother due to her unwillingness to cooperate with an evaluation. *Id.* at 28. However, he "endorsed the kinship providers as an appropriate resource should the [c]ourt choose to move forward with the termination of [F]ather's parental rights." *Id.* Moreover, Dr. Bernstein testified that he did not support reunification with Father because "of limited, inconsistent, and sporadic contact he had with his son, his own respective challenges with addictions, legal problems as well, and that he did not have housing at the time that would have been an appropriate placement for his son as well." *Id.* at 29. Finally, Dr. Bernstein observed that Child had negative reactions following his limited contact with Father.

Father testified on his own behalf. Father informed the court that he was Child's primary caretaker for the first four years of Child's life, often taking Child to work with him, because Mother was an addict. He explained that when Child was born he was on parole, and during those four years "[t]hat was the longest I have ever had on parole without no violations because I found my new drug was my kid. I had a responsibility to keep him safe and teach him the way to live, not the way I grew up, and protect him from trauma. . . He was my life." N.T. Hearing, 3/5/24, at 12. Father stated that during Child's fourth birthday party, Mother became upset that Father would not give her money for drugs so "she called parole and made false allegations . . [and] told them I had a gun" and told police that Father had threatened her. *Id.* at 13. Father explained that this prompted the SWAT team to surround the house and arrest him in front of Child. Father explained that he pled guilty to Disorderly Conduct and the court sentenced him to two years' incarceration and he "lost four years of street time" and "extended my max date to August of '26." *Id.* at 14. Father testified that, once the Agency became involved, he was able to have weekly virtual visits with Child for about a year while incarcerated. Father also stated that he sent child a couple of homemade cards.

Father testified that while he was living at the halfway house, he worked for a non-profit organization called Center for Employment Opportunity where he counseled, mentored, and tutored inmates and homeless individuals. During that time, Father also became a certified DATS, or drug and alcohol

treatment specialist. Father testified that he successfully completed sexual offender treatment programs "multiple times" while he was incarcerated. *Id.* at 23. He also testified that he participated in the Community Correction Center while incarcerated, "where you do group every day, you do personal growth, and you do SUDS program and other programs, stuff like that. Parenting groups." *Id.* at 26. Father explained that when he lived in the halfway house, he had transportation issues getting from Pittsburgh to Butler for visitation with Child.

Father testified that when Child lived with him "[w]e were best friends." *Id.* at 18. Father testified that "I was a good father to that boy. And it just – it devastates me to what he's going through. I mean, I know what trauma is. Like I grew up as a traumatized kid. I'm a survivor and I don't want him to go that direction." *Id.* at 39-40. Father admitted that he is an addict but explained that "when I do relapse, I do catch it and I deal with it. That's part of the process." *Id.* at 47.

Father testified that he does not want his parental rights to be terminated. Father explained that he anticipates being released in April of 2024 to a halfway house. He testified that he will not have difficulty finding a job, but locating appropriate housing and childcare would prove to be more difficult. He stated that he would need a year to be ready to care for Child.

On April 10, 2024, the trial court issued a Memorandum Opinion as well as a decree terminating Father's parental rights.

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issue for our review:

1. Whether the [c]ourt erred in terminating the parental rights of [Father] despite the failure of [the Agency] to offer resources to Father.

2. Whether the [c]ourt erred in terminating the parental rights of Father due to his SORNA registration requirements when he was only required to register for 10 years at the time of his conviction?

3. Whether the [c]ourt erred in terminating the parental rights of [Father] when the expert failed to take into consideration the other children in the home of the foster parents?

Father's Br. at 6.

**A.**

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial

- 8 -

court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody[,] and control of their children." *L.A.K.*, 265 A.3d at 591. "It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *Id.* at 591. Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. *In re*

*Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017). "Initially, the focus is on the conduct of the parent." *Id.* (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted).

Notably, our Supreme Court has held that "[n]either subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014). As our High Court explained, denying termination for that reason would only "punish an innocent child" rather than promote the child's best interests. *Id.* at 675. Moreover, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on subsection 2511(a)(1).

Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a

child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. *K.Z.S.*, 946 A.2d at 758. "Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition [and] the most critical period for evaluation is the six months immediately preceding the filing of the termination petition." *L.A.K.*, 265 A.3d at 592.

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

- 11 -

*Id.* (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances." *Id.* (citations and internal quotation marks omitted). "To that end, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citations and internal quotation marks omitted).

> Our Supreme Court has explained:
>
> Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). . . . It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case.

*Id.* at 593.

**B.**

In his first issue, Father avers that that trial court erred in terminating Father's parental rights when the Agency failed to offer Father resources.

- 12 -

Father's Br. at 6. Father argues that Father took affirmative steps to maintain his relationship with Child but faced the impediment of a lack of resources to aid him with reunification. *Id.* at 13. Father argues that he would have benefitted from transportation to visits, case management services, and housing services. *Id.* Essentially, Father argues that the Agency failed to make reasonable efforts to reunify him with Child.

Father's argument lacks merit because, as noted above, "[n]either subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *D.C.D.*, 105 A.3d at 672. Moreover, the court found that Father did not take affirmative steps to reunify with Child. Rather, the court found that "the very limited visitation by [] Father does not meet the criteria for performance of parental duties under the statute. Since at least the time of Child's adjudication on February 24, 2022, neither parent has provided physical, emotional, or financial support, except for limited interaction in a supervised setting." Trial Ct. Op., 4/9/24, at 11.

The court acknowledged that Father was residing in a halfway house for the six months immediately preceding the Agency's filing of the termination petition and faced transportation challenges getting to visitation with Child. *Id*. at 12. The court found Ms. Fischer's testimony to be credible that Family Pathways offered Father special accommodations, including weekend visitation, to assist Father but he "was not receptive." *Id.* The court also

emphasized that Father's own actions caused him to be re-incarcerated and, therefore, unable to perform parental duties for Child. The court opined:

> While the distance involved created a burden for Father, there is no valid excuse for attending only one visit during the time when he resided at the halfway house. Father was offered accommodations by Family Pathways to work around his schedule. He offered no credible explanation for his lack of initiative to be involved in Child's life. . . Furthermore, Father's actions directly caused his incarceration and inability to perform parental duties. Father was incarcerated since the inception of the dependency case, and then was granted the opportunity to re-establish a relationship with Child while at the halfway house, but he subsequently violated his parole and was imprisoned. Therefore, [the Agency] proved by clear and convincing evidence the ground for termination under Section 2511(a)(1) as to the parental rights of [] Father.

*Id.* at 12-13. Our review of the record supports the trial court's findings. We decline to usurp the court's credibility determinations or reweigh the evidence. We conclude that the trial court did not abuse its discretion when it terminated Father's parental rights pursuant to Section 2511(a)(1).[4]

**C.**

In his second issue, Father avers that the court erred in terminating his parental rights pursuant to Section 2511(a)(11), which allows a court to terminate parental rights if the parent is required to register as a sexual offender under 42 Pa.C.S. Ch. 97 Subch. H or I, when he was only required to register for ten years at the time of his conviction. Father's Br. at 6; 23 Pa.C.S. § 2511(a)(11). In his third issue, Father avers that the court erred in

---

[4] Father fails to raise a challenge to Section 2511(b) and, therefore, we decline to address it *sua sponte*.

terminating Father's parental rights when "the expert" failed to take into consideration the other children in the home of the foster parents. *Id.* For the following reasons, both issues are waived.

To support his second and third issues, Father offers a total of three sentences that baldly state his positions without citing to relevant authority or the record to support his positions. *See* Father's Br. at 13. "The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Commonwealth v. Martz*, 232 A.3d 801, 811 (Pa. Super. 2020) (citation and bracketed language omitted); *see* Pa.R.A.P. 2119 (listing argument requirements for appellate briefs). This Court "will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived." *In re R.D.*, 44 A.3d 657, 674 (Pa. Super. 2012) (citation omitted). Father fails to provide any legal or analytical framework within which this Court can conduct meaningful appellate review of issues two and three. Accordingly, we find them waived.

## D.

In conclusion, the trial court did not abuse its discretion when it terminated Father's parental rights pursuant to Section 2511(a)(1) and we find Father's remaining issues to be waived.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/04/2024